1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          SOUTHERN DISTRICT OF CALIFORNIA
10
11   RAMON BENITEZ,                        Case No.:  17CV1926-CAB(LL)
12                        Petitioner,
                                          **ORDER DENYING PETITION**
13   v.                                   **FOR WRIT OF HABEAS**
                                          **CORPUS;**
14   CHARLES W. CALLAHAN,
     Warden,                              **AND DENYING CERTIFICATE**
15                                        **OF APPEALABILITY**
                        Respondent.
16
17
18         Petitioner Ramon Benitez ("Petitioner" or "Benitez"), a state prisoner

19   proceeding pro se with a Petition for Writ of Habeas Corpus pursuant to 28

20   U.S.C. § 2254, challenges his 2014 conviction in San Diego Superior Court case

21   number SCD242443 on seven counts of committing a lewd act on a child under

22   the age of fourteen in violation of California Penal Code § 288(a).  (Pet., ECF No.

23   1 at 2.)[1]  For the reasons set forth below, the Court **DENIES** the Petition for Writ

24   of Habeas Corpus and **DECLINES** to issue a certificate of appealability.

25   _____
26
27   [1] Page numbers for docketed materials in this Order refer to those affixed by the Court's
     Electronic Case Filing system.
28
                                          1
                                                          17CV1926-CAB(LL)

1    **I.    FACTUAL BACKGROUND**

2        The Court gives deference to state court findings of fact and presumes

3    them to be correct; Petitioner may rebut the presumption of correctness, but only

4    by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see*

5    *also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact,

6    including inferences properly drawn from those facts, are entitled to a statutory

7    presumption of correctness).  The following facts are taken from the California

8    Court of Appeal opinion:

9        Benitez was the stepfather of the victim, minor Wendy V., and had
10       been in her life since she was two years old.  Wendy lived with
         Benitez, her mother, Maria V., [FN2 omitted] and her three half
11       siblings.

12       In March 2012, Wendy told her middle school guidance counselor,
13       Gloria Aycox, that Benitez had touched her breasts on multiple
         occasions.  Aycox contacted the San Diego County Health and
14       Human Services Agency, Child Welfare Services (CWS), and police
15       became involved.

16       CWS social worker Juanita Aguayo interviewed Wendy at school;
17       Wendy told Aguayo that Benitez had touched her more than once.
         Aguayo interviewed Benitez, who denied the allegations.  She then
18       referred the case to social worker Patricia Alvarenga.

19
20       Alvarenga interviewed Benitez, who denied the allegations.  She kept
         an open-door policy, however, and Benitez later came back to
21       Alvarenga's office.  He stated he knew he had done something
22       wrong.  Benitez admitted touching Wendy's breasts on three separate
         occasions after Wendy had asked him about her stretch marks.  He
23       stated he touched Wendy's vagina once by accident when tickling her
24       and had "jokingly" told Wendy not to report the incident.

25       In June 2012, Wendy met with Marisol Olguin, a forensic interviewer
26       for the Rady Children's Hospital.  Wendy told Olguin that Benitez had
         touched her and tried to lick her breasts on several occasions.  She
27       was young the first time he touched her vagina.  Benitez came home

                                    2
28                                                      17CV1926-CAB(LL)

drunk, pushed his hand under Wendy's undergarments, and inserted his finger in her vagina. Wendy recalled Benitez masturbating in front of her and preventing her from leaving the room. Benitez would ask her to lick his penis and masturbate him, but she had never done so. Wendy described an incident in Tijuana, Mexico, in which she and Benitez were alone in a hotel room waiting for someone. Benitez tried to take off her clothes and have sex with her, but Wendy started crying, and Benitez masturbated in front of her instead.

Benitez spoke to police detectives in August 2012. Detective Donna Eastep read Benitez his *Miranda*[2] rights in Spanish, but she misstated the work "guardar" (meaning "to remain") as "jugar" (meaning "to play"). As a result, Benitez was advised, in relevant part: "You have the right to *play* silent. If you give up the right to play silent, anything you say, can, and will be used in court against you." (Italics added.) Detective Eastep asked Benitez if he understood his rights as read. Benitez answered in the affirmative and proceeded to speak with the detectives. He denied ever touching Wendy sexually but admitted having touched the sides of her breasts on two occasions when she asked him about her stretch marks. He also admitted touching Wendy's vagina once by accident, while playing. Benitez told detectives Wendy had twice walked in on him masturbating. He admitted taking Wendy to a hotel room in Tijuana to wait for someone but denied anything sexual occurred.

Benitez was charged with seven counts of lewd acts on a child under the age of 14. (§ 288, subd. (a).) The People alleged Benitez touched Wendy's breasts and vagina, both over and under her clothing, between 2005 and 2012. Four of the counts alleged substantial sexual contact. (§ 1203.066, subd. (a)(8).) Prior to trial, the court granted the People's motion to exclude evidence relating to Wendy's prior sexual conduct with her cousin and denied Benitez's motion to exclude his August 2012 statement to police. These evidentiary rulings are central to Benitez's appeal.

At trial, Wendy testified that Benitez had been molesting her since she was in elementary school. She described him as touching her

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

17CV1926-CAB(LL)

vagina once when she was sleeping with her siblings; rubbing her vagina over her clothes when they sat on the couch; reaching into her shirt to fondle her breasts during a car ride from Tijuana to San Diego; masturbating in front of her on multiple occasions without allowing her to leave; and pinning her down and pulling off her leggings and underwear. Wendy testified about the incident in a Tijuana hotel room. She recounted that Benitez undressed and tried to take off her jeans to have sex with her; when she started crying, Benitez masturbated in front of her instead. Benitez had told Wendy before that incident that he wanted to have sex with her. Wendy testified that Benitez threatened her not to report him. On cross-examination, Wendy admitted having asked Benitez about stretch marks near her breasts when her body was changing but denied ever showing the marks to him. She admitted having walked in on Benitez once by accident when he was masturbating but distinguished this incident from the times Benitez purposefully masturbated in front of her.

Aycox, Wendy's friend Rose M., and Aguayo testified that Wendy appeared afraid, nervous, and shaky the day she reported the molestation. The jury watched a recording of Olguin's June 2012 forensic interview of Wendy, in which Wendy recalled incidents in greater detail. Olguin testified it was not unusual for a child to recall sexual molestation in greater detail during a one-on-one forensic interview as compared to later during trial. The prosecution's expert witness, Catherine McClennan, testified about behaviors and coping mechanisms of child sexual molestation victims; she explained it was not uncommon for victims to focus attention elsewhere during abuse and lose memories of specific instances as time passed. The People also examined Alvarenga and Detective Eastep, who testified about Benitez's admissions.

The defense case largely focused on Wendy's inability to remember specific instances of touching during trial. The defense examined clinical and forensic psychologist Bruce Yanofsky, who testified Benitez lacked the psychosocial orientation or interests of a person who would have committed a lewd act on a child.

(Lodgment No. 7 at 2-6.)

4

17CV1926-CAB(LL)

## II.  PROCEDURAL BACKGROUND

On February 25, 2014, the San Diego District Attorney filed an amended information charging Petitioner with seven counts of lewd act upon a child (Cal. Penal Code § 288(a)).  (Lodgment No. 3 at 10-13.)  In the amended information, it was also alleged that Petitioner had substantial sexual conduct with a child under fourteen years of age in counts 4-7 (Cal. Penal Code § 1203.066(a)(8)).  (*Id.*)

Prior to trial, Petitioner filed a motion to exclude his statements to police detectives.  (*Id.* at 16-27.)  He argued the *Miranda* warning provided to him in Spanish was defective because he was advised "you have the right to *play* silent," which prevented him "from being fully and unambiguously advised of his rights under *Miranda*."  (*Id.* at 17.)  The trial court denied the motion, stating, "I find that, based on the totality of the circumstances, that the defendant was aware of his right to remain silent . . . [a]nd therefore, the statements are admissible . . . [a]nd I find that the concept was reasonably conveyed."  (Lodgment No. 1 vol. 1 at 12.)  On March 4, 2014, a jury found Petitioner guilty of all seven counts of lewd act upon a child, and found the substantial sexual conduct allegations to be true.  (*Id.* at 145, 148-54; *see also* Lodgment No. 1, vol. 2 at 489-95.)  On April 2, 2014, the trial court sentenced Petitioner to eighteen years in prison.  (Lodgment No. 3 at 155; *see also* Lodgment No. 1, vol. 2 at 502.)

Petitioner appealed his conviction to the California Court of Appeal, arguing (1) the trial court erred by admitting his statements to police detectives because the *Miranda* warnings given to him were defective and (2) his defense counsel rendered him ineffective assistance.  (Lodgment No. 4.)  The California Court of Appeal affirmed Petitioner's conviction on March 29, 2016 in Case No. D065747. (Lodgment No. 7.)  Petitioner filed a petition for review in the California Supreme

Court, raising the same claims. (Lodgment No. 8.) The court denied the petition without comment or citation on June 29, 2016 in Case No. S234381. (Lodgment No. 9.)

On September 21, 2017, Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court. (ECF No. 1.) Respondent filed an Answer on December 15, 2017. (ECF No. 5.) Petitioner did not file a Traverse. Upon due consideration, the Court has determined that neither a Report and Recommendation nor oral argument is necessary for the disposition of this matter.

## III. DISCUSSION

### A. Standard of Review

Title 28, United States Code § 2254(a), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides that in order to obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (West 2006); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the federal court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions, but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (*overruled on other grounds by Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

//

7

## B. Claim 1 – Defective *Miranda* Warning

In claim one, Petitioner contends the trial court violated his Fifth and Fourteenth Amendment rights to due process and against self-incrimination when it improperly admitted statements made by Petitioner to police. (Pet., ECF No. 1 at 8.) Petitioner contends the *Miranda* warnings given to him by the police were defective, as Detective Eastep incorrectly pronounced the Spanish word "guardar," meaning "to remain," as "jugar," which means "to play." (*Id.*) Petitioner argues because the *Miranda* warnings were not reasonably conveyed, his waiver of the right to remain silent was invalid. (*Id.*) Petitioner raised this claim in his petition for review to the California Supreme Court, which was denied without comment or citation. As such, the Court "looks through" to the last reasoned state court decision to address the claim, that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805-06. The appellate court denied the claim, stating:

> Benitez argues the judgment of conviction should be reversed because the trial court admitted statements he made to police in August 2012. He argues he received defective *Miranda* warnings before speaking with police. Benitez is a native Spanish speaker, and Detective Eastep delivered the *Miranda* advisements in Spanish. The parties do not dispute that in advising Benitez of his *Miranda* rights, Detective Eastep used the word "jugar" (to play) instead of "guardar" (to remain), with the result that Benitez was told he had the right to *play* silent and that if he gave up the right to *play* silent, anything he said could and would be used against him in court. The trial court denied Benitez's motion to exclude his statement to police, finding that under the totality of circumstances, Benitez "was aware of his right to remain silent," and the concept had been "reasonably conveyed." As we explain, Benitez's *Miranda* warnings were not rendered constitutionally defective by Detective Eastep's misstatement of one Spanish word; under the totality of the circumstances, Benitez was aware of his right to remain silent.

(Lodgment No. 7 at 6-7.) After setting forth the applicable law under

8

*Miranda* and its progeny, the court continued:

> Applying these principles, Detective Eastep's *Miranda* warnings were not constitutionally defective as a result of her misuse of the word "play" instead of "remain." When viewed in the "totality of the circumstances," telling Benitez he had the right to play silent and that anything he said could be used against him in court reasonably conveyed to Benitez the substances of his right to remain silent. (See *United States v. Hernandez* (10th Cir. 1996) 93 F.3d 1493, 1502 ["It is true that [the police interpreter's] translation was imperfect. However, warnings that convey the substance of the suspect's rights are sufficient."]; *People v. Mayfield* (1993) 5 Cal.4th 142, 172 [rejecting defendant's argument that *Miranda* waiver was invalid because of detective's use of the first person rather than the second in reading defendant's rights because "it was obvious whose waiver was being sought"].) Benitez stated he understood his *Miranda* rights as advised, which supports his knowing and voluntary waiver of his right to remain silent. (*People v. Marquez* (1992) 1 Cal.4th 553, 570 [although *Miranda* warnings read in Spanish contained a few words that may have been confusing, trial court properly concluded waiver was knowing and voluntary where detective read defendant's rights in Spanish, asked the defendant in Spanish if he understood, and defendant replied in the affirmative].)

(Lodgment No. 7 at 8-9.)

### 1. *Miranda* Analysis

"[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda*, 384 U.S. at 478. Procedural safeguards must be employed to protect the privilege, in the form of the following measures: "[An individual] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479. A suspect must be advised "in clear

9

and unequivocal terms that he has the right to remain silent." *Id.* at 467-68. "The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court." *Id.* at 469. This ensures the individual is aware of the consequences of foregoing the right to remain silent, as only through an awareness of the consequences can there be an intelligent exercise of the right to not be compelled to incriminate oneself. *Id.*

The Supreme Court has "never insisted that *Miranda* warnings be given in the exact form described in that decision." *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989). "*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures." *California v. Prysock*, 453 U.S. 355, 359 (1981). Rather, the Court in *Miranda* stated that "[t]he warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent*, prerequisites to the admissibility of any statement made by a defendant." *Id.* at 359-60 (citing *Miranda*, 384 U.S. at 476) (emphasis in original). *Miranda* warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Duckworth*, 492 U.S. at 203 (citing *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)). "Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*." *Id.* (citing *Prysock*, 453 U.S. at 361); *see also United States v. Tillman*, 963 F.2d 137, 141 (6th Cir. 1992) ("Although there is no mandate that 'magic words' be used, there is a requirement that all elements of *Miranda* be conveyed.").

A defendant may waive the rights set forth in the warnings so long as the waiver is made "voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citing *Miranda*, 384 U.S. at 444). An inquiry into waiver

17CV1926-CAB(LL)

has "two distinct dimensions." *Id.* "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, a waiver must "have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (citations omitted); *see also Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010).

Petitioner contends Detective Eastep did not reasonably convey his right to remain silent because she used "jugar" (to play) instead of "guardar" (to remain) when administering his *Miranda* warnings, which resulted in him being told "you have the right to *play* silent." (Pet., ECF No. 1 at 36.) This improper advisement of his right to remain silent, he argues, rendered his waiver of the right invalid. He asserts the word "play" connotes a "sense of whimsy" as the most common meanings of "play" involve pretending, acting as a character (such as when one "plays" a part), or engaging in conduct for enjoyment (such as when people "play" together). *Id.* at 37. Petitioner explains being told he had a right to "play" silent meant he was being told he could *pretend* to be silent, not that he had a right to *remain* silent. *Id.* at 38. It would have been reasonable for Petitioner to believe, he argues, that unless he answered the police officers' questions, they would believe he was guilty. *Id.* He contends further the defective warning conveyed the opposite of remaining silent, as it conveyed that "he had to answer questions or police would believe he was guilty and just playing dumb with them." *Id.*

As the state appellate court found, the police detective reasonably conveyed the substance of Petitioner's right to remain silent. Although Petitioner

17CV1926-CAB(LL)

was told in Spanish that he had the right to *play* silent, this was in essence telling him he had the right to *be* silent. Again, Petitioner was advised, "You have the right to play silent. If you give up the right to play silent, anything you say can and will be used in court against you." (Lodgment No. 3 at 22.) Being told he could play silent, or pretend to be silent, act silent, or be silent for enjoyment, is not inconsistent with *remaining* silent, and sufficiently conveyed to Petitioner his right to be silent. *See Duckworth*, 492 U.S. at 203; *Prysock*, 435 U.S. at 361. "The translation of a suspect's *Miranda* rights need not be a perfect one, so long as the defendant understands that he does not need to speak to the police and that any statement he makes may be used against him." *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990). Petitioner's interpretation of the warnings as given is unreasonable and strained, as nothing in the statement above conveys the meaning Petitioner attempts to ascribe to it, that unless he answered questions, the police would believe "he was guilty and just playing dumb." Moreover, the detective informing Petitioner that anything he said "can and will be used in court against you" eliminated any sense of "whimsy" that could be attributed to the statement "you have the right to play silent." *See Miranda*, 384 U.S. at 469 (explaining that the "anything you say can be used against you in a court of law" warning "may serve to make the individual more acutely aware that he is faced with a phase of the adversary system").

Under the totality of the circumstances of his police interrogation, as the California Court of Appeal found, Petitioner knowingly and voluntarily waived his right to remain silent. When asked if he understood the rights that had been administered to him, Petitioner answered in the affirmative. (*See* Lodgment No. 3 at 22.) He did not express any lack of understanding or confusion around the use of "jugar" instead of "guardar." When asked further, "Having in mind and understanding your rights as I told you, are you willing to speak to me?"

12

Petitioner again answered in the affirmative. *Id.* Petitioner does not contend his waiver of the right to remain silent was the result of intimidation, and there is no evidence in the record that Petitioner's waiver was coerced. He does not claim that police threatened or injured him, or that he was fearful in any way. The record shows Petitioner knew he could stay silent, he could request a lawyer, and his statements could be used in court against him, yet he never invoked the right to remain silent nor the right to counsel during questioning. Notwithstanding the mistranslation of his *Miranda* rights, Petitioner voluntarily, knowingly, and intelligently waived his right to remain silent. *See Burbine*, 475 U.S. at 421*; see also United States v. Bustillos-Munoz*, 235 F.3d 505, 515-16 (10th Cir. 2000) (finding ambiguity in Spanish version of *Miranda* warnings did not render waiver invalid).

In *United States v. Hernandez*, cited by Respondent, the Tenth Circuit considered a case in which a deputy sheriff asked an acquaintance to serve as a Spanish interpreter during an interrogation, even though the acquaintance had a third-grade education, had no training as an interpreter, had never acted as an interpreter, and did not read either English or Spanish very well. *See Hernandez*, 93 F.3d 1493, 1496-97 (10th Cir. 1996). However, the court acknowledged the acquaintance's translation of the *Miranda* warnings was imperfect, as he told the defendant she had the right to remain silent, that anything she said may be to her detriment and could be used against her "according to the law," that she had the right to "contract" an attorney before and during questioning, that an attorney would be provided if she could not afford one, and that she had the right to change her mind and not answer questions. *Id.* at 1497. The court determined the warnings were sufficient because they "convey[ed] the substance of the suspect's rights." *Id.* at 1502. "A translation of a suspect's *Miranda* rights need not be perfect if the defendant understands that he or she need not speak to the

police, that any statement may be used against him or her, that he or she has the right to an attorney, and that an attorney will be appointed if he or she cannot afford one." *Id.* (citations omitted). Additionally, the court found the interpreter's failure to translate "waive" when he asked the defendant, "With your rights, are you willing to answer any questions he asks you?" did not invalidate the waiver, as the defendant had been informed of her "basic rights, which is all that is required." *Id.* at 1502-03.

The Ninth Circuit has also considered the provision of imperfect *Miranda* warnings by police in Spanish. In *United States v. Botello-Rosales*, 728 F.3d 865, 867-68 (9th Cir. 2013), the police detective used the Spanish word "libre" to mean "free," or without cost, when administering *Miranda* rights to the defendant. The trial court determined the usage of "libre" to mean "without cost" was an incorrect translation, in that "libre" actually translates to "free," as in being available or at liberty to do something. *Id.* at 867. The Ninth Circuit found the warning as given, that a lawyer who was free could be appointed, suggested the right to appointed counsel was contingent on the approval of a request or on the lawyer's availability, rather than being the government's absolute obligation. *Id.* Such a warning, the court concluded, was "affirmatively misleading" and did not satisfy *Miranda*'s requirements. *Id.* In *United States v. Perez-Lopez*, 348 F.3d 839 (9th Cir. 2003), the police officer advised the defendant, "[Y]ou have the right to solicit the court for an attorney if you have no funds." *Id.* at 847. The court found this warning to be constitutionally infirm because it did not convey the government's obligation to appoint an attorney if the defendant could not afford one. *Id.* at 848. "To be required to 'solicit' the court . . . implies the possibility of rejection." *Id.* The court recognized that although *Miranda* did not require a "talismanic incantation" to satisfy its strictures, it "does not permit an affirmative misleading advisory." *Id.* Unlike *Botello-*

14

*Rosales* and *Perez-Lopez*, the ambiguity here did not affirmatively mislead Petitioner nor did it negate the core requirements of *Miranda*. While "to play" does not have the same meaning as "to remain," as discussed above, telling an individual he has the right to *play* silent is not misleading nor inconsistent with the right to remain silent.

The Court concludes there is substantial support in the record for the state appellate court's conclusion that Detective Eastep properly advised Petitioner of his *Miranda* rights.

## 2. Harmless Error Analysis

Petitioner contends the erroneous admission of a statement obtained in violation of *Miranda* requires reversal of the judgment unless the error was harmless beyond a reasonable doubt. (Pet., ECF No. 1 at 8.) The California Court of Appeal found that even if the trial court erred by admitting Petitioner's statements to police, any error was harmless:

> Even were we to assume that Benitez's statement was obtained in violation of *Miranda*, we conclude its admission in this case was harmless beyond a reasonable doubt. (*Cunningham, supra*, 25 Cal.4th at p. 994 [applying harmless error standard to alleged *Miranda* violation]; *Chapman v. California* (1967) 386 U.S. 18, 24 ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].) "'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" (*Chapman*, at p. 23.)
>
> There is no reasonable probability that Benitez's statements to police contributed to his conviction. Benitez made almost identical statements to social worker Alvarenga, who testified at trial. He told both police and Alvarenga he had touched Wendy's breasts to check for stretch marks—he told police he had done so twice and Alvarenga three times. He told both police and Alvarenga he touched Wendy's vagina over her clothes by accident while they were playing. The only additional information Benitez provided to police, but not to

15

Alvarenga, was that Wendy walked in on him masturbating on two occasions and that he took Wendy to a hotel room in Tijuana (where he denied anything sexual occurred). This information was produced at trial independent of the police statement. Wendy testified having walked in on Benitez masturbating by accident, but she distinguished the incident from instances where Benitez forced her to watch him masturbate. Wendy also testified about the incident in Tijuana, and the jury watched her taped interview with forensic interviewer Olguin in which she described what occurred.

(Lodgment No. 7 at 10-11.)

Admissions of statements obtained in violation of *Miranda* are subject to direct review under the harmless error standard of *Chapman v. California*, 386 U.S. 18, 24 (1967). *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). "[T]he test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder v. United States*, 527 U.S. 1, 15 (1999) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). On collateral review, however, the *Chapman* standard does not apply. In federal habeas proceedings under § 2254, a court must assess the prejudicial impact of constitutional error in state court criminal proceedings under the "substantial and injurious effect" standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007). Under the *Brecht* standard, "an error is harmless unless the 'record review leaves the conscientious judge in grave doubt about the likely effect of an error on the jury's verdict . . . [i.e.,] that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Padilla v. Terhune*, 309 F.3d 614, 621-22 (9th Cir. 2002) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). When a state court has determined that a constitutional error was harmless, federal habeas relief is not available unless the state court applied

harmless error review in an objectively unreasonable manner.  *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003).

Petitioner contends the admission of his statements to police at trial was not harmless.  First, he argues he made his most incriminating statements to police.  He acknowledges he told both police and the social worker, Alvarenga, that he touched Wendy's breasts to check for stretch marks and accidentally touched her vagina over her clothes while tickling her, but argues he told only the police detectives that he had taken Wendy to a hotel in Tijuana and that she had twice accidentally walked in on him masturbating.  (Pet., ECF No. 1 at 40.) Petitioner believes the admission of these statements was highly prejudicial because the prosecution used them to corroborate Wendy's accusation that he attempted to have sex with her in the hotel room and masturbated in front of her when she refused.  (*Id.* at 41-42.)  Petitioner argues that had these statements not been admitted, the jury may have believed his statements to the social worker that his touching of Wendy was not sexual.  (*Id.* at 42.)  Second, Petitioner claims the admission of his statements to police was prejudicial because the prosecution used his inconsistent statements about the number of times he stated he touched Wendy's breasts to check for stretch marks—he told the social worker this happened three times but told the police it was twice—to undermine his credibility.  (*Id.* at 41.)  Third, Petitioner contends Wendy gave conflicting testimony, and that had it not been for the admission of his statement to police that he stayed in a hotel room with Wendy on one occasion, the jury may have doubted her credibility.  (*Id.* at 41-42.)

The state appellate court's finding that there no reasonable probability that Petitioner's statements to police contributed to his conviction was not unreasonable.  As observed by the state court, Petitioner's statements to police were essentially the same as the statements he made to Alvarenga.  The key

17

portions of the police statement that were not identical—his admission that he had taken Wendy to a hotel room in Tijuana and that she had previously seen him masturbating—came into evidence independently at trial via Wendy's testimony.  Additionally, Petitioner gave multiple inconsistent statements about touching Wendy's breasts.  He initially denied any touching to Aguayo and Alvarenga, then admitted touching Wendy's breasts three times to Alvarenga, and told the defense expert, Dr. Yanofsky, he had touched them only once. (Lodgment No. 1 vol. 2 at 369-70.)  Thus, even excluding his statement to police, Petitioner gave multiple inconsistent statements regarding the number of times he touched Wendy's breasts.  Even if the jury could have inferred from Petitioner's statements to police that he was not credible because of his inconsistent statements, the overwhelming evidence presented at trial against Petitioner (Wendy's testimony, as well as that of her friend Rose, the social worker Alvarenga, and the school counselor Aycox) overshadowed any such inference.  Moreover, it is improbable, as Petitioner contends, the jury would have doubted Wendy's credibility due to her inconsistent statements, particularly given Olguin's testimony that children reporting incidents of sexual abuse have problems with memory and anxiety when recounting their abuse (*see* Lodgment No. 1 vol. 2 at 224) as well as McClennan's testimony that "over a period of time, kids do lose that memory of individual things" and that inconsistencies are not automatically a "red flag" (*see id.* at 276, 278).

Even if Petitioner's statements to police had been excluded at trial, there was sufficient evidence of Petitioner's guilt.  In order to prove that Petitioner committed the crime of lewd act upon a child under the age of fourteen, the prosecution was required to show (1) Petitioner willfully touched any part of Wendy's body either on the bare skin or through her clothing; (2) Petitioner committed the act with the intent of arousing, appealing to, or gratifying the lust,

passions, or sexual desires of himself or Wendy; and (3) Wendy was under the age of fourteen at the time of the act.  *See* Judicial Council of California Criminal Jury Instruction (CALCRIM) No. 1100; Lodgment No. 3 at 88.  In California, the conviction of a sexual assault crime may be based on the testimony of a complaining witness alone.  CALCRIM No. 1190; Lodgment No. 3 at 90.  In light of Wendy's impactful testimony, there is no reasonable probability the admission at trial of Petitioner's statements to police in which he acknowledged taking Wendy to a hotel room in Tijuana, that Wendy had previously walked in on him masturbating, and in which he gave a conflicting statement about the number of times he touched Wendy's breasts, contributed to his conviction.  Thus, the California Court of Appeal's determination that any *Miranda* error was harmless beyond a reasonable doubt error was not objectively unreasonable.  The state court carefully applied the *Chapman* standard, and examined the other incriminating evidence presented at trial before finding harmless error.  Even assuming *arguendo* there was a *Miranda* error, any error was harmless under *Brecht* and thus habeas relief is not warranted.

In sum, there is ample evidence in the trial record supporting the state appellate court's conclusion that Petitioner was adequately advised of his *Miranda* rights, and that he knowingly, intelligently, and voluntarily waived those rights.  The state appellate court's harmless error analysis was not objectively unreasonable.  The Court accordingly finds the California Court of Appeal's determination that Petitioner's Fifth and Fourteenth Amendment rights to due process and against self-incrimination were not violated by the admission at trial of his police statement was neither contrary to, nor an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  Accordingly, the Court **DENIES** habeas relief as to Petitioner's

*Miranda* claim.

### C. Claim Two – Ineffective Assistance of Counsel

In claim two, Petitioner contends he received ineffective assistance of counsel, in violation of the Sixth Amendment, when his trial counsel, Deputy Public Defender Patrick McCoy, failed to raise arguments demonstrating the relevance and admissibility of evidence relating to prior sexual incidents between Wendy and her cousin, Giovanni, and failed to follow the procedures in California Evidence Code section 782 to seek the admissibility of this evidence. (Pet., ECF No. 1 at 48-62.) Specifically, during the preliminary hearing, Wendy testified that in 2010, her cousin came to her house, pulled down her leggings, and had sexual intercourse with her against her will. (Lodgment No. 2 at 66-67.) She also testified that on other occasions, she had touched and masturbated Giovanni's penis and he had touched her private parts. (*Id.* at 88-89.) Petitioner raised this claim in his petition for review to the California Supreme Court, which was denied without comment or citation. As such, the Court "looks through" to the last reasoned state court decision to address the claim, that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805-06. The appellate court properly identified *Strickland v. Washington*, 466 U.S. 668 (1984), as setting forth the governing law applicable to claims of ineffective assistance of counsel, and denied the claim, finding that Petitioner had not met "his burden to show prejudice from his counsel's alleged shortcomings." (Lodgment No. 7 at 12.)

Under California law, "Evidence of a victim's prior sexual conduct may be admissible when offered to attack the victim's credibility, 'provided that its probative value outweighs the danger of undue prejudice and the defendant otherwise complies with the procedures set forth in Evidence Code section 782.'"

(Lodgment No. 7 at 14 [citing *People v. Fontana*, 49 Cal. 4th 351, 354 (2010)].)[3] Under Evidence Code section 782, a defendant seeking to introduce evidence of the witness's prior sexual conduct is required to file a written motion containing an offer of proof detailing the relevance of the proffered evidence to the victim's credibility. (*Id.* at 14 n.7 [citations omitted].) If the offer of proof is sufficient, the court holds a hearing outside the jury's presence to allow questioning of the witness regarding the offer of proof. (*Id.* [citation omitted].) If the court finds the evidence relevant under California law and admissible under Evidence Code section 352, "the court may make an order stating what evidence may be introduced by the defendant and what questions are permitted." (*Id.* [citation omitted].) Evidence Code section 352 allows a court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Cal. Evid. Code § 352.

With respect to the prior sexual incidents involving Wendy and her cousin, the state appellate court explained:

> The People moved to exclude this evidence at trial. Benitez's counsel objected, arguing it could bear on Wendy's credibility. Benitez's counsel suggested Maria and Benitez may have restricted Wendy more after the incident, causing a rift and leading Wendy to fabricate the allegations against Benitez. The court asked whether Benitez's counsel wanted to make an offer of proof; he declined, stating he had not had a chance to speak with Wendy and could only suggest that there might be several ways in which the evidence could become relevant. The court noted Benitez could elicit testimony from Wendy at trial as to whether she was reacting to any restrictions at

---

[3] California Evidence Code section 782 was recently amended to reflect technical, non-substantive changes. *See* S.B. 1494, 2018 Leg., Reg. Sess. (Cal. 2018).

home.  Questioning the relevance of Wendy's 2010 sexual contact with Giovanni, the court granted the People's motion to exclude the evidence.

On appeal, Benitez contends evidence of Wendy's prior sexual history with Giovanni was admissible to challenge Wendy's credibility. Benitez contends this evidence bears on Wendy's credibility in several ways.  We conclude the probative value of the proffered evidence is limited, and the evidence would have been excluded under Evidence Code section 352, irrespective of whether Benitez's counsel filed a motion under Evidence Code section 782.  (Evid. Code §§ 782, subd. (a)(4), 352.)  Where, as here, evidence of a child molestation victim's prior sexual contact is more prejudicial than probative of the victim's credibility, the evidence is properly excluded at trial.  (*People v. Woodward* (2004) 116 Cal.App.4th 821, 832 (*Woodward*); *[People v. Mestas* (2013) 217 Cal.App.4th 1509, 1518].)

(Lodgment No. 7 at 15-16.)

In response to Petitioner's argument that the evidence may have cast doubt on whether Wendy's knowledge about the appearance of an erect penis and ejaculation was learned through Giovanni's acts as opposed to Petitioner's acts, the court found there was no dispute that Wendy, who was high-school aged, knew how a penis looked, as she testified she had walked in on Petitioner masturbating and had taken a sex education class in eighth grade.  (*Id.* at 16-17.)  The court was not persuaded by Petitioner's contentions that Wendy's failure to report Petitioner's molestation when she reported the 2010 incident, her failure to report Giovanni's molestation when she reported Petitioner in 2012, and Petitioner's reaction to the 2010 incident, in which he encouraged Wendy to report the incident to police, called into question Wendy's credibility.  (*Id.* at 18.)  The court found that given Wendy's testimony that she was afraid to report Petitioner's molestation because he had threatened her, her failure

to report Petitioner in 2010 had limited probative value.  (*Id.*)  The court also determined that Wendy's failure to report Giovanni's molestation in 2012, when asked generally by Olguin if anyone else had ever done what her stepfather did to her or had done anything to her she did not want them to do, was of limited probative value given Olguin's testimony that it was not unusual for child molestation victims to fail to recall specific instances of abuse in response to general questions.  (*Id.* at 18-19.)  The court continued:

> Indeed, the trial court considered and rejected, on relevance grounds, nearly all the evidence Benitez seeks to introduce.  During the preliminary hearing, Wendy testified about her failure to report Benitez to the police or social worker in reporting the 2010 incident; her failure to report the 2010 incident to the social worker in reporting Benitez in this case; Giovanni's masturbation and sexual acts; and Benitez's concern for Wendy after the incident.  In granting the People's motion to exclude at trial, the trial court considered Wendy's testimony as a whole and appropriately determined that evidence of Wendy's prior sexual conduct with Giovanni was not relevant.  [FN9 omitted]  The failure to conduct an evidentiary hearing under Evidence Code section 782 was harmless because the same evidence was elicited during the preliminary hearing and determined inadmissible on relevance grounds.  (See [*People v. Fontana* (2010) 49 Cal.4th 351, 367] [failure to conduct hearing was "assuredly harmless"; "trial court did ultimately conduct a hearing as to those injuries after defendant filed a motion for new trial," and "evidence at the posttrial hearing rebutted the defense theory of relevance"].)

> Finally, Benitez argues the 2010 incident bears on Wendy's credibility because Wendy may have fabricated allegations against Benitez in this case in retaliation for stricter rules in the house after the incident with Giovanni.  The trial court properly denied an evidentiary hearing on this speculative theory.  (*Mestas, supra*, 217 Cal.App.4th at p. 1518 ["The purpose of an Evidence Code section 782 hearing is to establish the truth and probative value of the offer of proof, not to allow a fishing expedition based on sketchy and unconfirmed allegations."].  In any event, Benitez suffered no prejudice because

23

his counsel was able to elicit testimony at trial bearing on this theory without referencing the 2010 incident. Wendy *rebutted* the theory by testifying she had no curfew and was not required to check in when she was away from home.

In short, evidence regarding Wendy's sexual contact with Giovanni in 2010 was inadmissible under Evidence Code section 352. Therefore, Benitez does not meet his burden to show prejudice as a result of his attorney's failure to advance every possible relevance theory or file a motion under Evidence Code section 782. There is no "reasonable probability" the result would have been different but for his counsel's alleged shortcomings ([*People v. Williams* (1997) 16 Cal.4th at 153, 214-215]), and his ineffective counsel argument is without merit.

(Lodgment No. 7 at 19-21.)

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. He must also show he was prejudiced by counsel's errors. *Id.* at 694. Prejudice can be demonstrated by a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.; see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993). Further, *Strickland* requires that "[j]udicial scrutiny of counsel's performance . . . be highly deferential." *Strickland*, 466 U.S. at 689. There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 686-87. The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id.* at 697.

17CV1926-CAB(LL)

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "The standards created by *Strickland* and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations omitted). These standards are "difficult to meet" and "demand[] that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Federal habeas functions as a "guard against extreme malfunctions in the state criminal justice systems," and not as a means of error correction. *Richter*, 562 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." *Strickland*, 466 U.S. at 687.

Petitioner has not established the state court's denial of his ineffective assistance of counsel claim is based on an unreasonable determination of the facts or is contrary to, or involves an unreasonable application of, the *Strickland* standard. Petitioner's trial counsel did not provide ineffective assistance by not filing a motion under California Evidence Code section 782 because such a motion would have been futile as the matter had already been fully litigated via the prosecution's motion to exclude. *See Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982) (providing that an attorney's failure to raise a meritless legal argument does not constitute ineffective assistance). Moreover, defense counsel could have reasonably decided the issue of Wendy's sexual conduct with Giovanni was moot after the court granted the prosecution's motion to exclude. As Respondent suggests, defense counsel may have theorized that the jury could have concluded Petitioner's willingness to contact the police regarding Giovanni's molestation may have revealed his confidence that Wendy would not report him. (Answer, ECF No. 5 at 28.) Trial counsel may have made the

tactical decision to not pursue the admission of evidence that Wendy had reluctantly had intercourse with her cousin as this may have led jurors to feel sympathy toward her. (*Id.*) "Counsel [are] entitled to formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107 (citations omitted). Counsel's performance "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference for counsel's judgments." *Strickland*, 466 U.S. at 691. Given that the trial court fully considered the admissibility of this evidence, and found its prejudicial impact outweighed its relevance, there is no reasonable probability the trial court would have admitted this evidence even if counsel had pressed for its admission. Petitioner has not established any reasonable probability that the result of the proceeding would have been different, and thus has not established any prejudice as a result of his counsel's alleged shortcomings. *Id.* at 694; *see also Baumann*, 692 U.S. at 572.

Accordingly, the state court's finding that Petitioner's trial counsel did not provide constitutionally ineffective assistance was neither contrary to, nor an unreasonable application of, the *Strickland* standard, nor was it based on an unreasonable determination of the facts. Petitioner's ineffectiveness assistance of counsel claim is **DENIED**.

## D. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a). Granting such a certificate is appropriate "only if the applicant has made a substantial showing of the denial of a constitutional right[.]" 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he

17CV1926-CAB(LL)

petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In this case, Petitioner has not made a substantial showing of the denial of a constitutional right.  Accordingly, the Court **DECLINES** to issue a certificate of appealability.

## IV.    CONCLUSION

Based on the foregoing, the Court **DENIES** the Petition for Writ of Habeas Corpus with prejudice.  Furthermore, the Court **DECLINES** to issue a certificate of appealability.

The Clerk of Court is instructed to terminate the case and enter judgment in favor of Respondent.

**IT IS SO ORDERED**.

Dated:  November 7, 2018

Hon. Cathy Ann Bencivengo
United States District Judge

17CV1926-CAB(LL)